UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

TALBOT ROBINSON                                        PLAINTIFF

VS.                          CIVIL ACTION NO. 3:16CV687TSL-RHW

THOMAS COLUCCI, INDIVIDUALLY AND AS              DEFENDANTS
EMPLOYEE OF U.S. XPRESS, INC., U.S. XPRESS,
INC.


MEMORANDUM OPINION AND ORDER

This cause is before the court on the various motions of the
parties. This includes defendants Thomas Colucci and U.S. Xpress'
motion in limine to strike Roger Allen as an expert; motion for
partial summary judgment on certain elements of plaintiff's
damages; motion in limine to exclude portions of the reports and
testimony of plaintiff's experts Bruce Brawner and George Carter;
motion to strike affidavit of Walter R. Shelton, M.D.; and motion
to strike untimely expert disclosures and other discovery.
Plaintiff Talbot Robinson has filed a motion for leave to file out
of time motion for reconsideration and motion to reopen discovery
as to punitive damages; a motion for leave to file out of time
motion to strike defendants' expert Harry Smith, Ph.D., M.D.; and
three motions in limine. With the exception of plaintiff's
motions in limine, briefing on these motions is complete. The
court has considered the memoranda of authorities, together with
attachments, submitted by the parties, on these various motions,
and now issues its rulings.

This case involves a motor vehicle accident that occurred on August 7, 2015 in which a U.S. Xpress truck driven by defendant Thomas Colucci struck the vehicle being driven by plaintiff Talbot Robinson. Plaintiff filed this action seeking compensatory and punitive damages. Defendants have admitted that Colucci was negligent and that his negligence was the sole proximate cause of the collision. They have also admitted that Colucci was in the course and scope of his employment at the time of the collision, making U.S. Xpress vicariously liable for his negligence and any injuries proximately caused to plaintiff. Therefore, the only issue remaining is the causation, scope and nature of plaintiff's damages.

By memorandum opinion and order entered October 30, 2017, this court granted defendants' motion for partial summary judgment on the issue of punitive damages. Defendants have now moved for partial summary judgment on several elements of compensatory damages, and they have filed various other motions challenging specific evidence sought to be offered by plaintiff regarding some of these elements of damages. The court will address the substance of defendants' partial summary judgment motion and the various interconnected motions as they relate to the types of damages at issue.

<u>Summary Judgment Standard</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a summary judgment motion, the moving party bears the initial burden of showing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

<u>Future Medical Expenses/Wage Loss Re: Knee Surgery</u>

Plaintiff alleges that as a result of the accident, he suffered injuries to both knees, for which he has already undergone two knee surgeries and for which he will require bilateral knee replacement surgeries within the next three to five years. He seeks recovery of future medical expenses for the

anticipated knee replacement surgeries and related therapy, together with lost wages he will incur as a result of time off in connection with those surgeries. Defendants have moved for summary judgment on plaintiff's claim for these damages, contending the record is void of proof that plaintiff will need knee replacement surgery and that consequently, plaintiff has no cognizable claim for future medical expenses or future lost wages relating to any such surgery.

Defendants' primary argument in support of their motion in this regard is based on their interpretation of letter reports of plaintiff's orthopedic surgeon, Walter Shelton, M.D., dated August 12, 2016, and March 19, 2017, which they contend do not demonstrate the need for future knee surgery to a reasonable degree of medical probability. In response to the motion, plaintiff has submitted a February 5, 2018 affidavit from Dr. Shelton in which he states plaintiff "will require future bilateral knee surgery replacement [sic] in the next three (3) to five (5) years" and will miss three months of work following each surgery.

Defendants have moved to strike Dr. Shelton's affidavit on the bases that his opinion therein regarding the need for future knee surgery (1) is inconsistent with his earlier letter opinions in which he opined (according to defendants) that future knee replacement was not necessary and (2) was not timely disclosed in

plaintiff's expert designation/report. Defendants contend that by submitting Dr. Shelton's recent affidavit which sets forth a new and/or contradictory opinion, plaintiff is improperly attempting to "supplement" his expert's prior opinions to defeat the partial summary judgment motion. The court, they argue, should therefore strike the affidavit and exclude any testimony by Dr. Shelton that plaintiff will require knee replacement surgery.

In a related vein, defendants have moved in limine to exclude portions of the reports and testimony of plaintiff's experts Bruce Brawner (certified rehabilitation counselor and life care planner) and George Carter (economist) estimating medical expenses and lost wages for time off in connection with future knee replacement surgeries.[1] Defendants submit that such opinions are not well-founded as there is no admissible expert medical evidence that plaintiff will need such future knee replacement surgery. For the reasons that follow, the court will deny all of defendants' motions to the extent they seek some form of relief based on

---

[1]    Bruce Brawner has prepared a life care plan which includes an estimate of $37,597.40 to $92,535.00 for plaintiff to have knee replacement surgery on both knees and to thereafter undergo related physical therapy. Brawner states that he included expenses for knee replacement surgery based on the August 12, 2016 report from Dr. Shelton which Brawner purportedly interpreted as "indicat[ing] that Mr. Robinson will require a total knee replacement in both knees." In turn, based on Brawner's report, George Carter, plaintiff's economist, has prepared estimates of future lost wages for time plaintiff will be off work in connection with future knee replacement surgeries.

defendant's contention that Dr. Shelton did not timely opine that plaintiff will likely need future knee replacement surgeries.

In his August 12, 2016 letter, Dr. Shelton wrote that plaintiff "has some symptoms with patellofemoral arthritis but we are going to treat this conservatively for now. It is not bad enough to require a total knee replacement at this time." In his March 9, 2017, letter report, Dr. Shelton stated,

> I do not think any further surgery is indicated or will help him. I do not think any clean out surgery will help him and at some point he may get bad enough to require a total knee replacement, but for right now we need to treat him conservatively as long as we can and he needs to lose weight.

Pursuant to Federal Rule of Civil Procedure 26, a party is required to disclose to the other parties the identity of any expert witness who will testify at trial and provide an expert report, setting forth the expert's proposed opinions. See Fed. R. Civ. P. 26(a)(2)(A)&(B). Under the court's local rules,

> (D) A party must designate physicians and other witnesses who are not retained or specially employed to provide expert testimony but are expected to be called to offer expert opinions at trial. No written report is required from such witnesses, but the party must disclose the subject matter on which the witness is expected to present evidence under FED. R. EVID. 702, 703 or 705, and a summary of the facts and opinions to which the witness is expected to testify.

L.U.Civ.R. 26(a)(2)(D). Such disclosure is required to be made on or before the deadline established in the case management order. See L.U.Civ.R. 26(a)(2) (party must "make full and complete disclosure as required by Fed. R. Civ. P. 26(a) and L.U.Civ.R.

26(a)(2)(D) no later than the time specified in the case management order."). A party is required to supplement his expert disclosures if he "learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). Under the court's Local Rule 26(a)(5), supplemental disclosures must be made "in no event later than the discovery deadline established by the case management order." L.U.Civ.R. 26(a)(5). The discovery deadline was January 30, 2018.

In the court's opinion, plaintiff timely disclosed Dr. Shelton's opinion that he would likely need knee replacement surgery. On August 16, 2016, well prior to providing his plaintiff's expert designation, plaintiff's counsel wrote to defense counsel that

> Mr. Robinson was recently seen by Dr. Shelton. ... Mr. Robinson is being told [by Dr. Shelton] that he needs bilateral knee replacement surgery. Dr. Shelton would like to postpone this as long as possible given Mr. Robinson's age of just turning fifty (50).

In response to interrogatories served in January 2017, which also preceded his expert designation, plaintiff reported that "Dr. Shelton has recommended bilateral knee replacement surgery and therefore the future medicals associated with these procedures which may total one (1) to two (2) for each knee are future

7

medical needs which the undersigned is attempting to quantify."
In response to an interrogatory specifically requesting
information regarding his experts' opinions, plaintiff advised:
"Dr. Shelton will testify as to the likelihood that Talbot
Robinson will need bilateral total knee replacements."

Plaintiff served his expert designation on April 3, 2017, in
which he stated, *inter alia*, that Dr. Shelton would provide
opinions consistent with his letter reports of April 12, 2016 and
March 3, 2017. Dr. Shelton's August 12, 2016 letter report
addressed the potential that plaintiff would require future knee
surgery stating, as defendants note, that he was treating
plaintiff's patellafemora arthritis in his knees conservatively
and the condition was "not bad enough to require a total knee
replacement *at this time*." (Emphasis added). He continued:

> [I]t is not inevitable that he is going to have to have
> bilateral total knees but he may. ... [I]n a reasonable
> degree of medical certainty, there is a probability that he
> may need a total knee replacement in both knees but not a
> certainty.

As is pertinent here, his March 19, 2017 letter merely recited
that "at some point he may get bad enough to require a total knee
replacement."

Contrary to defendants' urging, Dr. Shelton's August 12, 2016
and March 9, 2017 letter reports do not state that plaintiff will
not need knee replacement surgery, and the opinion expressed in
his affidavit does not contradict in any way the opinions set

forth in his earlier letter opinions.  In both letter opinions, he stated only that plaintiff did not need knee replacement surgery *at that time*; and in both, he stated that plaintiff could eventually require knee replacement surgery.  The statement in Dr. Shelton's affidavit is fully consistent with those earlier statements.

Moreover, the opinion that plaintiff will likely need knee replacement surgery cannot fairly be characterized as a *new* opinion which was not previously disclosed.  Dr. Shelton's letter opinion of August 2016 may have been somewhat ambiguous on this point, reciting, as it did, that while it was not "a certainty" that plaintiff will require knee replacement surgery, "there is a *probability* that he *may* need a total knee replacement in both knees...."  However, in response to interrogatories specifically requesting the substance of plaintiff's experts' opinions, plaintiff made clear that Dr. Shelton would testify that plaintiff would likely need bilateral knee replacement surgery.  The rules require supplementation of an incomplete or incorrect statement of an expert's opinion unless additional or corrective information was otherwise made known to the other parties "during the discovery process or in writing."  Here, plaintiff provided the correct information during the discovery process and in writing. For all of these reasons, defendants' objections to Dr. Shelton's opinion that plaintiff will require future knee replacement

surgery are not well-founded.  Dr. Shelton's affidavit will be allowed, as will Bruce Brawner's and George Carter's opinions as to future medical expenses.[2]

The court also rejects defendants' contention that since there is no proof that plaintiff will need future surgery, Brawner's and Carter's opinions as to future lost wages should be excluded.  Plaintiff seeks future lost wages for the six months Dr. Shelton has said he will be required to be off work for knee replacement surgeries (three months per surgery).[3]  As to the amount of such loss, Carter, plaintiff's expert economist, initially opined in a March 2017 Economic Analysis that plaintiff would have a discounted wage loss of $13,956 for time off related to future knee replacement surgeries.[4]  Carter based this calculation on Bruce Brawner's Vocational Rehabilitation

---

[2]     It follows that to the extent that defendants' motion to strike untimely expert disclosure and other discovery seeks to strike demonstrative exhibits for use during the testimony of Dr. Shelton, it will be denied.

[3]     Defendants argued in their motion in limine to exclude certain testimony of Brawner and Carter that Carter's opinion on future wage loss should be excluded as unreliable as there was no evidence that plaintiff would "ever lose any wages" as a result of the subject accident.  However, to the extent plaintiff is claiming wage loss associated with being off work for knee surgery, he has a cognizable claim for future lost wages.

[4]     Defendants point out that the sole opinion Brawner has offered regarding wage loss is that plaintiff's total earnings, based on his tax returns, went down from $107,914.00 in 2014 to $102,810.00 in 2015.  It does not appear that Brawner has offered an opinion as to the amount of any future wage loss.  Rather, that opinion has come from Carter.

Evaluation, which stated that plaintiff would likely be off work three *weeks* for each of two future knee replacement surgeries; so, using plaintiff's 2014 base income of $107,914, Carter calculated a six week loss of income.[5]  More recently, on February 16, 2018, Carter prepared a letter report/opinion in which he has recalculated plaintiff's future wage loss resulting from time off for the knee replacement surgeries based on information from Dr. Shelton that plaintiff will have to be off work for three *months,* not weeks, following each surgery.  Using the same methodology as before but assuming three months off work instead of three weeks, Carter has opined that plaintiff will have a future wage loss of $19,873 (assuming the surgeries are done in year three) and $19,481 (assuming they are done in year five).

Defendants have moved to exclude Carter's February 2018 opinion regarding lost wages in connection with future knee replacement surgery on the basis that this is a new opinion that

---

[5]     Quoting Brawner's report, Carter's initial report explained:
> "It is anticipated that Mr. Robinson will be off for 6 weeks in the future due to testimony concerning future treatment to his knee and knee replacement." Hon. Baskin L. Jones, e-mail dated March 30, 2017.

> 6 weeks is 6/52 = 0.1154 year.  Mr. Robinson's base income prior to the accident was $107,914. Bruce Brawner, M.Ed., CRC, CCM, LPC, Vocational Rehabilitation Evaluation dated March 29, 2017, page 20.   Thus, the value of the 6 weeks is 0.1154 x $107,914 = $12,453.

was not timely disclosed.  However, as Carter's supplemental opinion merely adjusts the figures in his original calculation to account for evidence that plaintiff will require three months, not three weeks, off work following knee replacement surgery, the court will deny defendant's motion to strike as to this part of Carter's February 2018 letter/opinion.

Past Lost Wages

Plaintiff claims that as a result of the injuries he sustained in the accident and resulting medical treatment, including surgeries, he was required to be off work, and as a consequence suffered a loss of wages, for which he seeks recovery. Defendants have moved for summary judgment on plaintiff's claim for past lost wages, arguing "[t]here is no proof that Robinson has lost wages as a result of the accident which is the subject of his complaint...."  Plaintiff declares in response that defendants are "wrong" and he points out that he has both testified by deposition that he "missed a lot of work" as a result of the injuries he sustained in the accident and has provided supplemental interrogatory responses clarifying/explaining the dates he was absent from work on account of his injuries, specifically, from August 10, 2015 to September 14, 2015 and from November 4, 2105 to March 16, 2016.[6]  Defendants' position,

---

[6]    In his original interrogatory response, plaintiff stated that he was off work following the accident until April or May of 2016, and that he "missed altogether 8 or more months of work."

12

however, does not appear to be that plaintiff did not miss any work due to the accident but rather that plaintiff has failed to come forward with evidence to prove that he actually lost any wages as a result of being off work. Thus, plaintiff's response misses the point of the motion. The issue is not how many days of work he missed but whether he lost income as a result of missing work due to injuries from the accident.

Under Mississippi law, it is the plaintiff's burden at trial to prove his damages by a preponderance of the evidence, both as to their cause and amount. See Patterson v. Liberty Assoc., L.P., 910 So.2d 1014, 1020 (Miss. 2004) ("The burden of proving damages rests upon the plaintiffs."). Thus, to avoid summary judgment on defendants' motion on his claim for lost wages, plaintiff must present sufficient evidence as would allow a reasonable jury to find he suffered a loss of wages as a proximate result of the accident. To create an issue of fact on the question of proximate cause, a plaintiff must produce evidence "which affords a reasonable basis for the conclusion that it is more likely than

_____

In a supplemental response, executed February 9, 2018, plaintiff states he was off work initially from August 10 to September 14, 2015, and then was off from November 4, 2015 to March 14, 2016. Defendants have moved to strike the February 9 and 12, 2018 supplemental responses, arguing that they represent new information which was not timely supplemented. To the extent that plaintiff has added the specific dates he missed work, the motion to strike will be denied as moot, given the court's conclusion, infra at p. 16, that summary judgment on past lost wages is in order as plaintiff has not demonstrated that he suffered a loss of wages from being off work for any period of time.

not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." Burnham v. Tabb, 508 So. 2d 1072, 1074 (Miss. 1987) (citing W. Keeton, Prosser & Keeton on Torts § 41 (5th ed. 1984). In the case at bar, defendants admit that Colucci's negligence was the proximate cause of the accident, and they do not dispute that plaintiff sustained some injury as a proximate result of the accident. Moreover, plaintiff has obviously presented evidence from which a jury could reasonably find that he missed approximately five and a half months of work as a result of injuries he suffered in the accident. What plaintiff has failed to do is come forward with any evidence to show that he lost any income as a result of this absence from work. The evidence does show that plaintiff's income in 2015 was $5,104 less than his income for 2014; but plaintiff has offered no evidence to tie that decrease in income to his time off work. It is tempting to assume from these facts that this decrease in earnings was on account of plaintiff's missing work. But the evidence also shows that in 2016, plaintiff's earnings actually increased, to $108,173, notwithstanding that he was off work for the first two and a half months of the year.

In a motion in limine filed March 29, 2018, plaintiff moved to exclude any reference to his total taxable earnings from 2015 to present. In that motion, after stating that his tax returns

for 2015, 2016 and 2017 show his income as $102,541, $108,173 and $113,475, respectively, he goes on to explain that he "used vacation time, was paid temporary disability coverage payments and worked overtime to supplement his past lost wages from his medical leave." He elaborates, stating,

> The reason Mr. Robinson was able to show earnings, albeit $5,000.00 less, in 2016 [sic] is because of his built up personal time off. He had to use forty (40) hours of personal time until his temporary disability payments kicked in. These disability payments (discussed supra, paragraph 26) supplemented his income. Additionally, Mr. Robinson worked overtime upon his return in 2016 and 2017 to make up for the time missed for his medical appointments. The Plaintiff's claim for past lost wages and future lost wages are well documented. For the Defendant to argue that Plaintiff made a similar amount of money in subsequent years would waste the Court's time and confuse the jury and paint Plaintiff in a false light.

Plaintiff thus argues *in his motion in limine* that "[d]efendants should be prohibited from suggesting he did not incur a loss merely because he was able to make up some of the difference in pay."

Defendants filed their motion for partial summary judgment on January 29, 2018; plaintiff filed his response on February 19. In that response, he did not so much as mention, much less submit evidence of receiving disability benefits or using leave time or working overtime to make up for income he would otherwise have lost due to being off work on account of injuries received in the accident. Assuming plaintiff has evidence to support the assertions in his motion in limine, the time to have come forward

with such evidence was in response to defendants' partial summary judgment motion. He did not do so (and in fact, to date, still has not presented any such proof).[7] Consequently, the record is void of any proof that plaintiff suffered a past wage loss as a proximate result of the accident, making summary judgment proper on plaintiff's claim for past lost wages.[8]

## Loss of Wage Earning Capacity

---

[7] Plaintiff should be in a position to know how he was compensated, whether by personal leave, disability payments or overtime work, and as such, he could have submitted an affidavit attesting to these matters in response to defendants' partial summary judgment motion. He did not do this. Later, on March 22, 2018, more than a month after briefing on the summary judgment motion was complete, plaintiff filed a response to defendants' motion to strike untimely disclosures in which he reported he was having difficulty timely obtaining evidence from plaintiff's employer to substantiate his lost wages. See Dkt. 164 (filed Mar. 22, 2018) (stating, "It is indeed the Defendants' right to demand strict proof of lost wages. However, accessing this information has been a challenge and a slow process."). If that was the case, then plaintiff could have requested a continuance under Rule 56(d), but once again, he did not do so.

[8] Based on the difference in income from 2014 to 2015, George Carter opined in his March 2017 Economic Analysis and again in a February 15, 2018 letter to plaintiff's counsel that plaintiff suffered a $4,086 after-tax loss of wages. But on February 21, 2018, at the instance of plaintiff's counsel, he issued another letter calculating plaintiff's after-tax lost wages as $36,895 (plaintiff's 2014 base income multiplied by the percentage of each year plaintiff was off work, .0958 in 2015 and .3313 in 2016, less applicable taxes). Defendants have moved in limine to exclude Carter's February 21, 2018 opinion as untimely. While this is an entirely new opinion that the court would exclude, the court will instead deny this part of defendants' motion in limine as moot based on its conclusion that defendants are entitled to summary judgment on plaintiff's claim for past lost wages.

Defendants have moved for partial summary judgment on plaintiff's claim for damages for loss of wage earning capacity contending he has not shown that his injuries from the accident have had or will have any affect on his future employment or employment prospects. In support, they point out that since the accident, Robinson has continued to work at his same job and further note that "[n]o doctor has testified or stated that Robinson must stop work now" or identified any restrictions that would limit his ability to perform his current job or other similar jobs. They note, for example, that the only limitations Dr. Shelton has identified are that plaintiff "can stand 4 hours out of an 8 hour day," squatting and bending should be limited to occasionally, and he should not lift over 20 pounds. Dr. Howard Katz opined that due to the condition of plaintiff's knees, he "would do better if he did not have to walk on concrete all day" and "if he could stand and walk frequently as opposed to constantly." Also, Brawner, in his Vocational Rehabilitation Evaluation, observed that Robinson's "employer is currently allowing him to work in his old position with modifications ... and it is recommended that he continue to work in this position as long as he can." Brawner found that "based on the recent opinions of Dr. Walter Shelton and Dr. Howard Katz, Robinson continues to be able to work in the light classification of work as defined by the U.S. Department of Labor," and that his "vocational prognosis

for future employment in a variety of sedentary and light positions is very good." None of this precludes his recovery for loss of wage earning capacity.

Under Mississippi law, a plaintiff "'may recover for loss of earning capacity even where he continues to work at the pre-injury rate of pay.'" <u>Coleman v. Swift Transp. Co. of Arizona, LLC</u>, No. 3:13-CV-0003-DMB-SAA, 2014 WL 3533322, at *6 (N.D. Miss. July 16, 2014) (quoting Johnny C. Parker, <u>Mississippi Law on Damages</u> § 35:4 (3d ed. 2013)). However, to recover such damages, he must put forth evidence that his injuries have resulted in a decrease in his wage earning capacity, and that his injuries adversely affect his employability or earning potential. <u>Id.</u> (citing <u>Mississippi Law on Damages</u> § 35.4). <u>See</u> <u>Walters v. Gilbert</u>, 248 Miss. 77, 93, 158 So. 2d 43, 50 (1963) ("[t]he extent of the physical impairment, together with the duration thereof, determines the amount of loss of earning capacity.").

Here, plaintiff has presented medical records to establish the nature and extent of his injuries from the accident, and has provided his own testimony and that of coworkers describing the effect of his injuries on his ability to fully perform his job. He testified, for example, that his job, as he performed it prior to the accident, involved near constant standing and walking, which he is no longer able to do. It also involved frequent bending, squatting and kneeling, which he cannot now do owing to

18

the injuries to his knees.  He states that he has been able to maintain his position with his company, but only because his employer thus far has been willing to make accommodations.  He testified, however, that as he can no longer perform the job at the same level as before, his post-accident performance evaluations have garnered him ratings of "meets" expectations instead of the "exceeds" expectation ratings he received prior to the accident.  He expressed concern about the effect of his performance on his future in his current position with the company, both from the standpoint of his ability to continue to perform the job long term and of his employer's willingness to maintain him in the position.  Plaintiff testified that because of these concerns, he has had discussions with one of his superiors about moving to a less physically demanding, yet lower paying position.  The medical evidence and plaintiff's testimony is plainly sufficient to create a jury issue on his claim for loss of wage earning capacity.  See Coleman, 2014 WL 3533322, at *6 (finding similar proof sufficient).  Therefore, defendants' motion for summary judgment on plaintiff's claim for recovery for loss of wage earning capacity will be denied.

While it is apparent in view of plaintiff's medical records and deposition testimony that defendants are not entitled to summary judgment as to this element of damage, defendants have objected to, and moved to strike, certain evidence bearing on

plaintiff's claimed damages for loss of earning capacity.

Specifically, they have moved to strike as untimely

(1) supplemental interrogatory responses served by plaintiff on

February 9 and 12, 2018;[9] and (2) letter opinions from George

Carter to plaintiff's counsel dated February 16 and 23, 2018, and

a Corrected Supplemental Life Plan Valuation of Carter, produced

February 20, 2018.

In his February 16 and 23, 2018 letters, Carter undertook to

respond to specific requests by plaintiff's counsel to calculate

the present value of a loss of wage earning capacity under

alternate scenarios. He was asked to assume, first, that

plaintiff would suffer a $40,000 per year loss of wage earning

capacity following knee replacement surgery and based on that

assumption to calculate a loss of wage earning capacity beginning

in three years and five years, respectively; and he was asked to

then make the same calculation assuming a 100% loss of wage

earning capacity following knee surgery. Carter opined that with

a $40,000 loss of wage earning capacity, the present value of the

loss of wage earning capacity would be $305,880 (year three) or

---

[9]     Plaintiff's supplemental interrogatory responses include
information regarding plaintiff's claimed limitations on his
ability to perform his job. As the court has noted, defendants
have moved to strike the supplemental responses as untimely.
However, the court does not consider that the information therein
regarding his limitations is new information. Rather, it is more
in the nature of a summary of existing information. Accordingly,
the court will deny the motion to strike plaintiff's supplemental
responses.

$247,217 (year five); and he opined that with a 100% loss of wage earning capacity, the amounts would be $825,217 (three years) and $667,027 (year five).

Plaintiff asserts that this is a "seasonable supplementation" which should not be stricken.  However, plaintiff's protestation notwithstanding, these are clearly new opinions from Carter which were not timely disclosed.  Carter has not at any time prior to his February 12, 2018 letter offered any opinion or calculation of plaintiff's loss of future wage earning capacity.  In determining whether to exclude experts or expert opinions not properly designated, the court considers four factors: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice."  Hamburger v. State Farm Mut. Auto. Ins. Co., 361 F.3d 875, 883 (5th Cir. 2004).  Here, plaintiff offers no valid reason for not timely disclosing these opinions from Carter.[10]  Further, while

---

[10]    He suggests that this "supplementation" is offered in light of testimony from Phil Ferguson, one of plaintiff's coworkers, that

> Plaintiff's job responsibilities require [him] to hop over and onto various conveyor belt(s) at the Siemens plant.  Often times since the crash, Talbot has fallen.  If Talbot falls, conditions may worsen. He can be immediately laid off or fired.  These contingencies boiled down into two scenarios were taken into account via a modification of Dr. Carter's reports.

The court is dubious of this explanation.  First, Ferguson was deposed in October 2017, more than three months before this new letter opinion from Carter.  Further, plaintiff himself would know

plaintiff suggests on the one hand that Carter's opinions are essential, he at the same time asserts that Carter is merely providing calculations based on the record evidence.[11] Particularly since Carter will offer testimony on other matters, which whill include evidence of plaintiff's work life expectancy, tax rates and discounting to present value, it is not essential to plaintiff's case that he provide a calculation of loss of wage earning capacity. These are computations that juries are more than capable of performing themselves, with proper instruction. Accordingly, they will be stricken.[12]

Emotional Distress/Cognitive Impairment/Pre-Judgment Interest

---

if he had fallen on the job and could have timely supplied that information.

[11] It does not appear to the court that there is an evidentiary basis for these new calculations. The suggestion that plaintiff may have a $40,000 per year or 100% loss of wage earning capacity because at some point in the future he may fall again, and if that happens his condition may worsen, and if his condition worsens, he may be laid off or get fired, is speculative, to say the least. Furthermore, despite what plaintiff says, it is obvious this is not the scenario Carter was asked to account for in his "supplemental" opinion; rather, his "supplemental" opinion is based on the assumption that plaintiff's future knee replacement surgeries may cause him to suffer a $40,000 per year loss of income or render him altogether unable to work. The court is unaware of any basis for such assumptions. Indeed, the notion that surgery would not improve but rather significantly worsen his condition would raise the question whether it was reasonable to undergo knee replacement surgery at all.

[12] The same observations and conclusion apply to defendants' motion to strike Carter's Corrected Supplemental Life Plan Valuation, by which Carter, for the first time, adds a "scenario 3" to his computation of life care costs.

Defendants have moved for partial summary judgment on any claim for damages for emotional distress, cognitive impairment and pre-judgment interest. Plaintiff concedes he cannot recover pre-judgment interest and states that he does not seek damages for cognitive impairment, making summary judgment proper as to these elements of damage. However, plaintiff opposes defendants' motion as it pertains to his claim for emotional distress damages. The court has considered the parties' arguments and finds that defendants' motion should be denied insofar as it seeks to foreclose plaintiff from recovering emotional distress damages. "Emotional distress is a reasonably foreseeable injury to a car-accident participant." Estate of Miles v. Burcham, 127 So. 3d 213, 218 (Miss. 2013). See also Choctaw Maid Farms, Inc. v. Hailey, 822 So. 2d 911, 928 (Miss. 2002) (plaintiff in personal injury action "may recover for past, present and future physical pain and suffering as well as resulting mental anguish where proven by a preponderance of the evidence") (citations omitted). Defendants argue that plaintiff's evidence of emotional distress damages is inadequate as he has "no proof from any source that Plaintiff has sought medical or psychological treatment for emotional distress" or "that any doctor has prescribed medicine or treatment for any such claim." However, no such proof is required where emotional distress is sought as an element of damages based on physical injury. See Estate of Miles, 127 So. 3d at 218. In

the court's opinion, plaintiff has clearly presented sufficient evidence to support jury consideration of his claim for emotional distress damages.  Therefore, this part of defendants' motion for partial summary judgment will be denied.

### Motion to Strike Roger Allen

Defendants' motion to strike Roger Allen will be denied as moot.  Plaintiff states that he did not designate Roger Allen as an expert because he does not intend to use him as an expert.

### Plaintiff's Request to File Motion for Reconsideration

Plaintiff has filed a motion for leave to file an out of time motion for reconsideration of this court's October 30, 2017, memorandum opinion and order granting defendants' motion for summary judgment on plaintiff's claim for punitive damages. Plaintiff argues that since the court's ruling, he has deposed defendant Colucci's co-driver, Earl Allen, Jr., and according to plaintiff, Allen provided testimony which plaintiff believes establishes a basis for his recovery of punitive damages.

Plaintiff further states that he "seeks to amend his response to comply with the Court's Order stating a Rule 56(d) affidavit should have been attached to their response [DOC 116] seeking additional time as discovery had not been completed." While much more could be said about plaintiff's motion, and particularly about plaintiff's intimation that the court directed or even suggested that he should take steps to comply with Rule

56(d), the court instead will state simply that plaintiff's motion for leave to seek reconsideration should be denied for reasons set forth in defendants' response to the motion.

### Motion to File Out of Time Motion to Strike Defendants' Expert, Harry Smith, Ph.D. and M.D.

Plaintiff has filed a motion to file an out of time motion to strike opinions of defense expert, Harry Smith, Ph.D./M.D. In his proposed motion, plaintiff first states that he has "questions regarding Dr. Smith's credentials and in particular his certifications as an engineer and licensing as an engineer as well as his experience and background in being able to offer evidence of the existence or causation relating to Plaintiff's orthopedic injuries." He goes on to identify three areas of concern, (1) relating to Dr. Smith's opinion that plaintiff had a pre-existing knee condition which first manifested itself immediately following the subject accident, (2) challenging the reliability of the methodology used by Dr. Smith, as a biomechanical engineer, in calculating the force of impact during the crash, and (3) relating to alleged inconsistencies in computer simulations and Dr. Smith's unproduced hand calculations. Plaintiff states that the court should "examine Dr. Smith's opinion and determine whether they are reliable and relevant opinions under the standards of Fed. R. Evid. 104(a) and 702(b) and (c).

In his motion to file his motion to strike out of time, plaintiff gives two reasons for not filing this motion by the

January 30, 2018 motion deadline established by the magistrate judge's August 30, 2017 text order extending the discovery and motion deadlines. First, he asserts he "misinterpreted" the magistrate judge's text only order to mean that January 30, 2018 was the deadline for *dispositive* motions only. Second, he claims that although he asserts in his motion that some or all of Dr. Smith's opinions should be excluded because they are unreliable, nevertheless, he "believed his Motion to Exclude Harry Smith was properly characterized as a Motion in Limine" and not a *Daubert* motion. He thus asks that the court either allow him to file the motion as an out of time <u>Daubert</u> motion or, alternatively, that the court treat the motion "as a motion in limine as to certain testimony." In the court's opinion, plaintiff's motion to file an out of time motion to strike Dr. Smith's opinions (or some of his opinions) should be denied. Plaintiff's counsel could not reasonably have interpreted the magistrate judge's text order to apply only to dispositive motions and not to <u>Daubert</u> motions. Local Rule 7(b)(D) states, "Unless otherwise ordered by the Case Management Order, all case dispositive motions and motions challenging an opposing party's expert must be filed no later than fourteen calendar days after the discovery deadline." L.U.Civ.R. 7(b)(D). At the parties' request, the magistrate judge extended the discovery deadline to January 6, 2018; he contemporaneously extended the motion deadline to fourteen days later, January 30,

2018.  Furthermore, plaintiff could not reasonably have

interpreted his proposed motion as anything other than a Daubert

motion.  The motion challenges the qualifications of Dr. Smith and

the reliability of his opinions, which is the precise purpose of a

Daubert motion.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137,

152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (purpose of Daubert

analysis "is to ensure the reliability and relevancy of expert

testimony"); Queen Trucking, Inc. v. GM Corp., No. 06-052, 2007 WL

4458919, *2 (N.D. Tex. June 8, 2007) ("A Daubert motion allows a

party to challenge the opposing party's expert witnesses on

several grounds.  First, a Daubert challenge allows a party to

challenge an expert's qualifications.  Further, an opposing party

may attack the reliability of an expert's testimony.").

Accordingly, the court, in its discretion, will deny plaintiff's

motion to file an untimely Daubert challenge to Dr. Smith.  See

Koch Foods, Inc. v. Pate Dawson Co., Inc., No. 3:16-CV-355-DCB-

MTP, 2018 WL 651371, at *3 (S.D. Miss. Jan. 31, 2018) (court need

not consider untimely-filed Daubert challenges) (citing Queen

Trucking, 2007 WL 4458919, at *2).[13]

---

[13]    The court did review plaintiff's proposed motion to
strike, primarily to ascertain whether it was in substance a
Daubert motion.  Based on its perusal of the motion, it does not
seem the motion has merit so it is unlikely it would be granted
even if allowed to be filed.  And of course, plaintiff is free to
cross examine Dr. Smith at trial.  But at this point, the court
will not exclude his testimony.

<u>Conclusion</u>

Based on the foregoing, it is ordered as follows:

(1) defendants' motion to strike Roger Allen as an expert (docket no. 135) is denied as moot;

(2) defendants' motion for partial summary judgment on certain elements of plaintiff's damages (docket no. 136) is granted in part and denied in part as set forth herein;

(3) defendants' motion in limine to exclude the reports and testimony of plaintiff's experts Brawner and Carter is denied;

(4) defendants' motion to strike affidavit of Walter R. Shelton, M.D. (docket no. 150) is denied;

(5) defendants' motion to strike untimely expert disclosures and other discovery (docket no. 155) is denied as moot to the supplemetation of plaintiff's interrogatory responses and as to Carter's supplementation, is granted in part and denied in part, as set forth herein;

(6) plaintiff's motion for leave to file out of time motion for reconsideration and for motion to reopen discovery as to punitive damages and for other relief is denied; and

(7) plaintiff's motion for leave to file out of time motion to strike defendants' expert Harry Smith, Ph.D., M.D. (docket no. 172) is denied.

SO ORDERED this the 1st day of May, 2018.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE